IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

**MICHAEL D. MCDONALD**,

       Plaintiff,

       v.

**MICHAEL J. ASTRUE**, **Commissioner of Social Security,**

       Defendant.

Case No. 6:10-cv-1126-SI

**OPINION AND ORDER**

Bruce W. Brewer
419 Fifth Street
Oregon City, Oregon 97045
      Attorney for Plaintiff

Amanda Marshall, United States Attorney
Adrian L. Brown, Assistant United States Attorney
U.S. Attorney's Office
District of Oregon
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204

David Morado, Regional Chief Counsel
Social Security Administration
Kathy Reif, Special assistant U.S. Attorney
Office of General Counsel
701 Fifth Avenue, Suite 2900
M/S 221A
Seattle, Washington 98104
      Attorneys for Defendant

**SIMON, District Judge.**

Opinion and Order, Page 1

# I. INTRODUCTION

This is an action to obtain judicial review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") denying the application of Michael McDonald for Disability Insurance Benefits ("DIB") and Supplemental Security Income benefits ("SSI"). Plaintiff alleges disability since January 10, 2001, based on herniated discs of the lumbar spine, asthma, anxiety, esophagitis, and irritable bowel syndrome ("IBS"). Plaintiff's date last insured for DIB is December 31, 2006.[1] For the reasons discussed below, the Commissioner's decision is affirmed.

# II. BACKGROUND

This is Plaintiff's second application for benefits. The earlier application, for both DIB and SSI, was filed September 17, 2002. Tr. 28. The claim was denied initially and on reconsideration. *Id.* A hearing was held on November 19, 2003, in San Francisco, California. *Id.* In a decision dated December 18, 2003, Administrative Law Judge ("ALJ")William Churchill found Plaintiff not disabled. Tr. 28-35. There is no indication in the record that the ALJ's decision was appealed.

Plaintiff filed another application for DIB and SSI benefits on April 6, 2006, alleging disability beginning January 10, 2001. The claims were denied initially and upon reconsideration. A hearing was held before Administrative Law Judge ("ALJ") James Yellowtail

---

[1] DIB benefits require at least 20 quarters of coverage within the 40-quarter period that ends with the quarter in which the disability occurred. The end of a claimant's insured status is frequently referred to as the "date last insured." In a DIB case, the claimant must prove that the current disability began on or before the date last insured. *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998). Proving disability before the date last insured is not necessary for receipt of SSI benefits.

on March 11, 2010. On March 19, 2010, the ALJ issued a decision finding Plaintiff not disabled. After the Appeals Council denied review on January July 10, 2010, the ALJ's decision became the final decision of the Commissioner.

Plaintiff was born in 1975 and was 35 years old at the time of the ALJ's decision. He is a high school graduate. His past relevant work is as a reservation agent.

## A.    Medical Evidence

On August 7, 2006, Plaintiff was examined by internist Jaskaran Momi, M.D. Tr. 179-181. Dr. Momi noted that Plaintiff reported a history of migraine headaches since the age of 13, with each headache occurring every two to three months and lasting two to seven days. Tr. 179. Plaintiff also gave a history of asthma and of low back pain beginning in December 1990. *Id.* Plaintiff said his pain was generally localized to the lower back, but frequently radiated into both legs. *Id.* Dr. Momi wrote that an MRI dated April 30, 2006, showed an annular tear with central disc bulge at L4-5 and L5-S1, but without significant central canal or neuroforaminal narrowing. *Id.* The 2006 MRI was not significantly different from an earlier MRI from 2001. *Id.*

Plaintiff reported that he was in pain 24 hours a day, seven days a week, and that it was like a sensation of electric current, starting from the lower back into the lower extremities to the feet and then turning back and going up into the lower extremities and the back. *Id.* Plaintiff said that on a good day, he could do all types of activities, but on a bad day he could not even get up from bed to use the bathroom. *Id.* Although Plaintiff had started physical therapy, he did not continue with it because it increased his pain. *Id.* An epidural injection had also increased his pain. *Id.* Although Plaintiff had been given prescription medication, he said he was not using any medication because none gave him any relief. *Id.*

Opinion and Order, Page 3

Upon examination, Dr. Momi found that Plaintiff's spinal curves were normal, but there was generalized tenderness all over his lumbar spine. Tr. 180. No spasm or tenderness of the paraspinous muscles was found. *Id.* All joints of the body showed normal range of movement. Muscle grip strength was normal. Reflexes were normal. Gait was normal without the help of a walking device, and Plaintiff was able to do toe and heel walk without difficulty. Tr. 181. Dr. Momi concluded that the objective findings of the examination indicated no limitations on sitting, standing, or walking for eight hours a day, nor any significant limitation on bending, stooping, reaching, handling, fingering, gripping and feeling. *Id.* Dr. Momi concluded that Plaintiff could lift and carry 25 pounds frequently and 50 pounds occasionally. *Id.*

On September 6, 2006, H.N. Mitchell, M.D., reviewed Plaintiff's medical records on behalf of the Commissioner and completed a Physical Residual Functional Capacity Assessment. Tr. 182-86. In Dr. Mitchell's opinion, Plaintiff could lift 10 pounds frequently and 20 pounds occasionally; stand or walk for about six hours out of an eight-hour work day and sit for about six hours in an eight-hour work day. Tr. 183. In Dr. Mitchell's opinion, Plaintiff's only environmental limitation was the avoidance of concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. Tr. 185.

On July 11, 2007, Plaintiff was seen by Donna Hammar, nurse practitioner, for asthma and low back pain. Tr. 194. He was awaiting a "scholarship medication" for Advair, but in the meantime, was using Nasacort inhaled steroid and Proventil. *Id.* Plaintiff believed his asthma was worse over the last few days, but he continued to smoke about half a pack of cigarettes a day. *Id.* Plaintiff reported that he was doing exercises prescribed by a physical therapist and riding his bike daily. *Id.* He requested a prescription for Soma to take at night when his back pain

was worse. *Id.*

On September 1, 2009, Plaintiff was evaluated by gastroenterologist Matthew Smith, M.D. Tr. 249-252. Dr. Smith wrote that a CT scan of Plaintiff's abdomen in January 2009 had been essentially unremarkable, other than the finding of a probable benign cavernous hemangioma in the right hepatic lobe. Tr. 249. Plaintiff reported a history of substernal chest burning consistent with gastrointestinal reflux disease ("GERD"), but the symptoms were completely controlled with Protonix twice a day. *Id.*

Plaintiff reported that he smoked half a pack of cigarettes a day and smoked marijuana occasionally, but did not drink or take other illicit drugs. Tr. 250. Physical examination revealed no acute distress. Tr. 250. There were "minimal" diffuse expiratory wheezes in bilateral lung fields. Tr. 251.

On September 9, 2009, Plaintiff began treatment with Mindy Sobota, M.D. Tr. 269. Dr. Sobota noted that Plaintiff was scheduled for a colonoscopy on September 14, 2009, and a liver MRI scan on September 11, 2009. Dr. Sobota also wrote, "He apparently had a sleep study years ago but has yet to get the CPAP for unclear reasons, but Linda is working on this. In the meantime, he has tried his significant other's Provigil and found great benefit in terms of daytime somnolence. He wonders whether I can prescribe this." *Id.* Dr. Sobota wrote a prescription for Provigil "until I can obtain more information about its use in addition or instead of CPAP." *Id.*

A colonoscopy on September 14, 2009 revealed esophagitis and areas of mild inflammation throughout the gastrointestinal tract of "unclear significance," the most likely cause thought to be inflammation induced by nonsteroidal anti-inflammatories ("NSAIDs").

Tr. 242. On September 25, 2009, Plaintiff saw Gary Olbrich, M.D. in Dr. Sobota's office for pain medication prescriptions. Tr. 268. Plaintiff reported no acute back symptoms and was given refills of oxycodone for one month. *Id.* On October 9, 2009, Plaintiff saw Dr. Sobota for a muscle relaxant refill. Tr. 267. Dr. Sobota wrote that Plaintiff's spinal symptoms seemed "slightly out of proportion with his findings," but agreed to write prescriptions for clonazepam and oxycodone. *Id.* Dr. Sobota urged Plaintiff to quit smoking because of his esophageal erosions. *Id.* On November 13, 2009, Dr. Sobota saw Plaintiff for medication refills and for a referral to a mental health practitioner. Tr. 266. Dr. Sobota again recorded that she thought "his symptoms are rather proportioned with [sic] his imaging, but I am curious to see what a neurosurgeon would say." *Id.* She agreed to continue Plaintiff on oxycodone and clonazepam. *Id.* Dr. Sobota also referred Plaintiff to Carol Burckhardt, mental health nurse practitioner, for treatment of anxiety. *Id.*

On December 4, 2009, Ms. Burckhardt saw Plaintiff for anxiety and depression. Tr. 264. Plaintiff reported that he was upset and depressed because he had broken up with his girlfriend two weeks earlier. *Id.* Plaintiff said he was currently doing "a lot of rapid cycling during the day" between feeling hypomanic and very depressed. *Id.* He also smoked marijuana for chronic pain, and played video games "as a way of focusing his mind, distracting himself from pain, and keeping his emotions in check." *Id.* Ms. Burckhardt noted that Plaintiff was "very fidgety in the chair," with his legs moving and jerking at times. *Id.* Plaintiff told her "that is one tenth of the muscle spasms he usually has," but Ms. Burckhardt "did not note any more severe movements during the time he was in the session." *Id.* Ms. Burckhardt observed that Plaintiff was "very tangential, flight of ideas, . . . almost impossible to keep him on topic," and with "an edge of

irritability at times." *Id.* Ms. Burckhardt started Plaintiff on Celexa for depression and wrote that

she would follow up with Plaintiff in two weeks. *Id.*

Plaintiff saw Eryn Joyce, LCSW, on December 11, 2009. Tr. 262. Ms. Joyce observed

that Plaintiff was "talkative, 'nervous' mood, leg spasms and jumpiness, occasionally jerks upper

body to the right; complains of pain." *Id.* Plaintiff told Ms. Joyce that after being on Celexa for

about two weeks, he was feeling more stable and sleeping 5-7 hours a night; she observed that

Plaintiff appeared "generally relaxed." Plaintiff continued on the Celexa. *Id.* On the same day,

Plaintiff told Lyle Urick, R.N. that his medication was controlling his pain and that no

medication change was needed. Tr. 261. He said that he had spasms in his lower back at times,

but was not having any at that time and that he was experiencing no side effects from his

medications. *Id.*

Dr. Sobota noted on December 18, 2009 that Plaintiff had reported "a state of 'spasm' in

his lower legs that could "last up to 15 minutes." Tr. 259. Dr. Sobota wrote, "Of note, he has

been out of his Klonopin for about a week." *Id.* Plaintiff said he had stopped smoking cigarettes.

*Id.* Dr. Sobota thought Plaintiff's back pain was "mostly exacerbated by stress and his lack of

medications which is a financial issue for him but he is able to fill his medicines today and

anticipates feeling a lot better." *Id.* She wrote that Plaintiff was in no apparent distress and that

he appeared "slightly better than usual." *Id.* On January 8, 2010, Dr. Sobota saw Plaintiff for a

dental infection and allowed Plaintiff to increase his oxycodone dose. Tr. 257. Otherwise, she

observed, he was "in no acute distress." *Id.* On the same date, Ms. Burckhardt wrote that

Plaintiff reported "increasingly bad mood swings." Tr. 256. Plaintiff said he had become more

manic, sometimes getting no more than two hours of sleep, and that his muscle spasms had been

increasing. *Id.* Ms. Burckhardt observed that Plaintiff had "constant jerking movements of his legs." *Id.*

Dr. Sobota wrote a letter on Plaintiff's behalf dated March 5, 2010, in which she stated that she had been Plaintiff's primary care provider since September 2009, meeting with him approximately every two months. Tr. 277. The letter was based on her personal observations and on the records of Ms. Burckhardt, "our psychiatric nurse practitioner who has seen Mr. McDonald 4 times in the past 3 months." *Id.* [2]

Dr. Sobota wrote that Plaintiff's medical diagnoses were:

a.  Chronic low back pain due to degenerative joint disease, with an annular tear and disc bulge at L4-L5 and L5-S1 documented by an MRI in July 2008;

b.  Irritable Bowel Syndrome--diagnosis of exclusion based on symptoms of abdominal pain, constipation/diarrhea, consultation with gastroenterology and negative colonoscopy September 2009;

c.  Sleep apnea--documented by a positive sleep study in August 2008;

d.  Erosive esophagitis--documented by esophagogastroduodenoscopy (EGD) in September 2009;

e.  Hypothyroidism--documented by abnormal thyroid-stimulating hormone (TSH) level = 9 accompanied by symptoms;

f.  Asthma, documented by clinical examination.

Tr. 277. Dr. Sobota wrote that Plaintiff's medical symptoms,

most notably those related to his degenerative disc disease and his irritable bowel syndrome, reportedly impede his daily function including the ability to get out of bed, complete activities of daily living like preparing food for himself, and work.

---

[2] The record shows only two meetings between Plaintiff and Ms. Burckhardt, one on December 4, 2009, tr. 264, and one on January 8, 2010, when Ms. Burckhardt wrote that she had seen Plaintiff "one other time." Tr. 256.

He is currently prescribed Lyrica as well as oxycodone titrated to 20 mg daily for his pain (he experiences too many side effects at higher doses) but still reports severe pain that interferes with his ability to social [sic] and physical functioning.

*Id.*

Dr. Sobota listed Plaintiff's psychiatric diagnoses as:

a.    Bipolar II Disorder–manifested by mood swings from sadness, lack of focus, difficulty concentrating to [sic] irritability, pressured speech, restlessness, and flight of ideas.

b.    Probable Post-Traumatic Stress Disorder secondary to childhood physical and emotional trauma–manifested by poor sleep, flashbacks, estrangement from others, and hypervigilance.

*Id.*

In Dr. Sobota's opinion, the psychiatric symptoms were "persistent and result in a very negative personal perception of ability to cope with stress and low expectations of ability to perform routine, scheduled work." Tr. 278. She added:

he reportedly has been trying to help his landlord by doing low-stress administrative work for up to 2 hours per day but 'can't take it,' feels weak and shaky, and has restarted smoking cigarettes, which he had quit 4 months ago. It is likely that his psychiatric symptoms greatly augment his physical symptoms. . . . We have not been successful in finding a drug regimen to alleviate his symptoms. Unfortunately, we have not had access to any previous psychological reports although Mr. McDonald indicates that he has had such assessments done at least 4 times in the past. Thus, it is impossible to determine whether his current symptoms are more or less severe than in the past.

Tr. 273. Dr. Sobota concluded that, in her opinion, Plaintiff "would miss full-time work in any occupation, even in a low stress environment, for more than 3 days per month." *Id.*

**B.    Hearing Testimony**

Plaintiff testified that he lives with friends who provide for all his material needs except food, which Plaintiff obtains with food stamps. Tr. 307. He last worked for two weeks in 2000 as a  short-term kennel assistant. *Id.* Before that, he worked for United Airlines as a Reservation

Sales Service Representative for "just under six months" in 1998. Tr. 308. Plaintiff said he was fired from his job with United Airlines for being late too often. *Id.* Before that job, he worked in "everything from construction to office work to heavy labor to driving trucks to moving furniture." Tr. 309. Most of these jobs were through a temporary service agency. *Id.*

The ALJ asked Plaintiff to explain what prevented him from working. Plaintiff responded that the "most important reason" was disc problems that caused pain down both legs and in his heel. Tr. 310. Plaintiff said the pain had "gotten to the point that I cannot concentrate on anything for very long," and that most of the time, he had to lie in bed for "six out of every eight hours," with the other two hours spent sitting up or trying to move. *Id.* The ALJ asked: "[D]o you have any other condition or conditions which prevent you from working?" and Plaintiff said, "Not that I know of." *Id.*

Plaintiff said he was taking Lyrica and oxycodone for pain, Klonopin as a muscle relaxant, and Advair and Ventolin. Tr. 311. He said that he used a cane because "if I don't, I'm going to fall down and not be able to get up for a while because my legs are spasming too hard underneath me," but the cane was not prescribed for him. Tr. 312. Plaintiff said he was able to care for his personal hygiene, grocery shop once a week, drive occasionally, and prepare simple meals. Tr. 313. He could only rarely do laundry. *Id.* He said he was able to go to medical and dental appointments and to "sit down and play video games." Tr. 314. He used the Internet occasionally, but said that the "screen starts to blur" after "about 10, 15 minutes from my pain levels." Tr. 315. Plaintiff said he spent most of the day sitting or lying in bed, watching TV, playing video games, or reading. Tr. 315. He could walk up to a quarter mile, but then had to sit down and rest for at least 20 minutes. *Id.* He said he could only walk about half a mile each day.

Opinion and Order, Page 10

*Id.*

Plaintiff testified that he was unable to stand for any length of time, saying that after "even a minute," the pain became excruciating and he had to move around. Tr. 316. He said that being in motion helped to relax the constant back spasms. *Id.* Plaintiff said that even as he was sitting in the hearing, "my right leg is bouncing and I cannot stop it because of the spasms in the calf and I am occasionally having lower back spasms that are causing my body to move side to side." *Id.* Plaintiff did not think he could sit for more than 20 or 30 minutes at a time without being in excruciating pain. *Id.* Asked whether he could lift anything, Plaintiff responded that it hurt to pick up even a gallon of milk, so he had to "stick to half gallons." Tr. 317. Plaintiff said when his pain levels were high, he had a "habit of snapping at people and yelling at them without meaning to." Tr. 318.

Plaintiff's attorney inquired about the symptoms of IBS. Plaintiff said he got severe cramps and could "feel everything that moves through my bowels," and "I sometimes have whole food come out." Tr. 319. Plaintiff said three or four days a week he could not be more than 15 minutes away from a bathroom. *Id.* Plaintiff also said that "generally with me depression turns into anger and what I have to do to get rid of it is sit and play violent video games." Tr. 321. He said he also had a "tendency to lash out." *Id.* Plaintiff said medication caused him to forget "basic things" and made it difficult for him to concentrate and remember. Tr. 322.

The ALJ called a vocational expert ("VE"), Mark McGowan. Tr. 325. The ALJ asked the VE to describe Plaintiff's past relevant work. Tr. 326. The VE responded that the job as reservation agent was sedentary and that having performed the job for approximately six months,

Plaintiff had had adequate time to learn the job. Tr. 322. The ALJ concluded from Plaintiff's earnings report that his other jobs had not been performed at the level of substantial gainful activity ("SGA").

The ALJ then asked the VE to consider a hypothetical individual Plaintiff's age with his work history and educational background, having the ability to lift 50 pounds occasionally and 25 pounds frequently, and no limitations on reaching, handling, fingering, bending, stooping, sitting, standing, or walking. Tr. 328. The VE opined that such a person would be capable of the exertional requirements of Plaintiff's past work as a reservation agent. The ALJ asked a second hypothetical question based on the assessment of Dr. Mitchell, which was the ability to lift 20 pounds occasionally and 10 pounds frequently; sit, stand and walk for six hours in an eight-hour workday; and required to avoid concentrated exposure to dust, fumes, odors, and poor ventilation. Tr. 329. The VE did not think such an individual could perform the work of reservations agent as Plaintiff had performed it because the job involved sitting eight hours a day, but that the individual could perform the job of reservations agent as defined in the Dictionary of Occupational Titles ("DOT"). *Id.*

The ALJ then asked the VE to consider a person with no past relevant work, with the ability to: (1) lift 20 pounds occasionally and 10 pounds frequently; (2) sit for six hours; (3) stand and walk between four and six hours; and (4) occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. The individual could not be exposed to dust, fumes, odors, poor ventilation, or hazards. Tr. 330. The VE opined that such an individual could perform the light jobs of office helper and cashier and the sedentary job of semiconductor assembler. Tr. 330-31.

C.    **Lay Witness Testimony**

The record contains a letter dated March 11, 2010, from Charlotte Eubank. Tr. 157-58.
Ms. Eubank states that she worked with Plaintiff at United Airlines and remained friends with
him after Plaintiff left that employment. Ms. Eubank states that she hired Plaintiff to wait tables
at a Japanese restaurant where she was manager, but that the restaurant "had to let him go
because the customers were made nervous by his twitching and when I put him in the kitchen he
could not do repetitive lifting without visible pain." Tr. 157. Ms. Eubank moved to Hawaii in
2003 but still visits San Francisco and Oregon, and has observed that Plaintiff has to spend a
great deal of time lying down. *Id.* She states that she has also seen Plaintiff's personality change
"from a bright cheery person to someone who is very depressed and in despair." Tr. 158.

John Doyle, an attorney, wrote a letter on Plaintiff's behalf dated March 13, 2010. Tr.
159. Mr. Doyle stated that he had known Plaintiff for more than 15 years, as a family friend and
a former employer of Plaintiff. *Id.* When Mr. Doyle and his wife Cornelia moved to
McMinnville from San Francisco in 2006, Plaintiff became a nonpaying resident in their
household. *Id.* Although initially Plaintiff was able to perform light office work for Mr. Doyle,
his work had eventually become unreliable and untimely because of "increasing pain and
spasms, as well as migraine headaches and other unpleasant side effects from prescribed
medication." *Id.* Mr. Doyle wrote that Plaintiff was "exhibiting severe symptoms of depression."
*Id.*

Cornelia Doyle also wrote a letter on Plaintiff's behalf, dated March 13, 2010. Tr. 160.
She wrote that since a back injury in December 1999, Plaintiff had "never been fully the same."
Tr. 160. She wrote that he had spasms that began in his legs, which "over time moved to take

over his whole body" and that his attempts to find steady employment had been futile as he "discovered employers do not like to hire twitching people or people that have to sit down, stand up or lie down at unpredictable times." *Id.*

## D.      The Sequential Evaluation

The Commissioner has established a five-step sequential process for determining whether a person is disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920. At step one, the Commissioner determines whether the claimant is currently engaging in any SGA. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the Commissioner proceeds to step two, to determine whether the claimant has a "medically severe impairment or combination of impairments." *Yuckert,* 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). That determination is governed by the "severity regulation," which provides:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience.

§§ 404.1520(c), 416.920(c). If the impairment is severe, the evaluation proceeds to the third step, where the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert,* 482 U.S. at 140-41. If a claimant's impairment meets or equals one or more of the listed impairments, the claimant is considered disabled without consideration of age, education or work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment, the Commissioner considers, at step four, whether the claimant can still perform "past relevant

Opinion and Order, Page 14

work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant shows an inability to perform past

work, the burden shifts to the Commissioner to show, in step five, that the claimant has the

residual functional capacity ("RFC") to do other work in consideration of the claimant's age,

education and past work experience. *Yuckert*, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f),

416.920(f).

**E.      Presumption Created by Prior Decision**

An unappealed denial of an application for disability benefits operates as issue preclusion

with respect to the finding of non-disability through the date of the prior decision. *See Chavez v.*

*Bowen,* 844 F.2d 691, 693 (9th Cir. 1988) (principles of *res judicata* apply to administrative

decisions). The earlier denial also creates a presumption of continuing non-disability with

respect to the period after the date of the prior decision. *Lester v. Chater,* 81 F.3d 821, 827 (9th

Cir. 1995). The presumption does not apply, however, if there are "changed circumstances."

*Taylor v. Heckler,* 765 F.2d 872, 875 (9th Cir. 1985). The presumption may be overcome by new

facts establishing a previously unlitigated impairment or other apparent error in the prior

determination, or where the claimant's unrepresented status has resulted in an inadequate record.

*Lester*, 81 F.3d at 827-28. *See also Vasquez v. Astrue*, 572 F.3d 586, 597 (9th Cir. 2009)

(principle of *res judicata* should not be rigidly applied in administrative proceedings, and

although normally an ALJ's finding that a claimant is not disabled creates a presumption that the

claimant continued to be able to work after that date, the presumption does not apply "where the

claimant raises a new issue, such as the existence of an impairment not considered in the

previous application.")

**F.      The ALJ's Decision**

Opinion and Order, Page 15

At step two, the ALJ found that Plaintiff's severe impairments were herniated and bulging discs, without significant stenosis, in the lumbar spine, and asthma. Tr. 15. The ALJ found Plaintiff's anxiety, esophagitis, and IBS not severe. *Id.* With respect to the IBS, the ALJ found that Plaintiff's treatment included "benign instructions to increase his fiber intake and to take naturopathic supplements such as probiotics," while endoscopy in 2009 revealed only mild inflammation. *Id.* The ALJ found that the esophagitis was "likely related to" Plaintiff's "lack of adherence to a GERD lifestyle modification (prior smoking and caffeinated beverages)" and to "possibly delayed gastric emptying from narcotics." *Id.* With respect to anxiety, the ALJ rejected the opinion of Ms. Burckhardt of possible bipolar disorder on the ground that Ms. Burckhardt was not an "acceptable medical source" and that her opinion was contradicted by that of another non-acceptable medical source, a social worker, who had assessed depression, PTSD, and chronic pain. Tr. 16.

The ALJ considered the four functional areas for evaluating mental disorders: (1) activities of daily living ("ADLs"); (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. The ALJ found that Plaintiff's limitations with respect to ADLs were mild, as he was able to engage in various activities, drive, and take care of his own personal needs and household chores. The ALJ found no limitations with respect to social functioning, concentration, persistence, or pace, and no episodes of decompensation. *Id.* The ALJ concluded that Plaintiff's impairments, standing alone or in combination, did not meet or equal one of the listed impairments.

The ALJ found Plaintiff's testimony that he sits or reclines during the day because of muscle spasms and constant pain inconsistent with his statement that he went for two short bike

rides per day. Tr. 17. The ALJ discounted Plaintiff's assertion that it took him an hour to walk

half a mile because Plaintiff had also stated that he "overextended" himself frequently. Tr. 18.

The ALJ rejected the post-hearing statements from third parties that they had witnessed

twitching and physical limitations on the ground that they were not persuasive "in the light of the

medical evidence in this case, which does not document objective medical findings consistent

with these statements." *Id.* The ALJ also noted that one of the third-party statements related that

in 2006, Plaintiff could still perform light office bookkeeping and filing and assist in telephone

communications. *Id.*

      The ALJ found Plaintiff's testimony about pain and incapacity unsupported by objective

clinical evidence, noting the 2004 normal lumbar spine image and the 2006 MRI showing an

annular tear with central disc bulge at L4-5 and L5-SI, but without significant central canal

stenosis or narrowing. The ALJ also cited Plaintiff's statement to Dr. Momi in 2006 that he had

not taken medications for a year because they did not help and his assertion that physical therapy

and injections only increased the pain. The ALJ also noted that early in 2007, Plaintiff told Ms.

Hammar he primarily used exercise for pain relief and that in April 2007, Plaintiff had responded

well to physical exercises. Tr. 18-19. In March 2008, Plaintiff reported to his naturopath that he

was working at an office job, perhaps seven hours a week. In May 2009, Plaintiff reported that

when he was taking narcotic pain medications, his pain level was "tolerable" and that by the end

of 2009 he was taking oxycodone and "continued to assert that his muscle spasms were helped

by medications." *Id.*  In December 2009, Plaintiff had reported that his medications adequately

controlled his pain and that he was not having spasms. *Id.*

      The ALJ gave no weight to Dr. Sobata's opinion that Plaintiff would miss more than

Opinion and Order, Page 17

three days of work a month because of his "medical and psychiatric diagnoses" and "severe pain that interferes with his ability to [maintain] social and physical functioning." *Id.* The ALJ found Dr. Sobota's opinion to be "overwhelmingly" based on subjective reports, without any corroboration by objective clinical findings. *Id.* The ALJ concluded that Plaintiff could perform light work with additional limitations on exposure to dust and fumes. Because Plaintiff had testified that his back impairment was what kept him from working, and not IBS or anxiety, the ALJ did not further limit Plaintiff's work capacity.

At step four, the ALJ concluded that Plaintiff could return to his past relevant work as a reservation agent. Tr. 20.  The ALJ continued to step five, however, and concluded, on the basis of the VE's testimony, that Plaintiff could perform the requirements of representative occupations such as office helper (DOT # 239.567-010), a light, unskilled job; semiconductor assembler (DOT # 726.684-034), a sedentary, semi-skilled job under the DOT but listed in the Department of Labor and Oregon publications as an unskilled job; and cashier II (DOT # 211.462-010, a light, unskilled job. Tr. 21.

### III.  STANDARD OF REVIEW

The Court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record.  *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999). In determining whether the Commissioner's findings are supported by substantial evidence, the Court must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.  *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's decision must be upheld even if  "the evidence is susceptible to more than one rational interpretation."

*Andrews v. Shalala,* 53 F.3d 1035, 1039-40 (9th Cir. 1995).

      The initial burden of proving disability rests on the claimant.  *Meanel*, 172 F.3d at 1113. To meet this burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). This means an impairment must be medically determinable before it is considered disabling.

## IV.  DISCUSSION

      Plaintiff asserts that the ALJ erred at step two by: (1) failing to address Plaintiff's sleep apnea; (2) finding Plaintiff's esophagitis, IBS, and mental impairments not severe; (3) failing to consider the fact that Plaintiff's herniated disc abutted the L5 root and the annular tear; and (4) rejecting the opinions of psychiatric nurse practitioner Carol Burckhardt on the ground that she was not an acceptable medical source. Plaintiff asserts that the ALJ erred at step three by: (1) failing properly to consider the combined effects of all of Plaintiff's impairments; (2) rejecting the opinions of Dr. Sobota; (3) rejecting Plaintiff's testimony; and (4) rejecting the lay testimony of Ms. Eubank, Mr. Doyle, and Ms. Doyle. Plaintiff asserts that the ALJ erred at step four because Plaintiff's past relevant work as a reservation agent was not performed at the SGA level. Plaintiff asserts that the ALJ erred at step five by departing from the Dictionary of Occupational

Titles ("DOT")[3] without adequate explanation. Finally, Plaintiff asserts that the ALJ erred in

relying on a previous decision by the Commissioner in formulating the hypothetical question to

the VE.

**A.      ALJ's Step Two Findings**

Plaintiff asserts that the ALJ erred by failing to address Plaintiff's sleep apnea and Dr.

Sobota's reliance upon it to support her opinion about Plaintiff's unemployability. Plaintiff

contends that the ALJ also erred with respect to the severity of his anxiety and depression

because Carol Burckhardt had found it "quite clear" that he suffered from anxiety and had

prescribed the anti-depressant Celexa.

The step-two inquiry is a *de minimis* screening device to dispose of groundless claims.

*Bowen v. Yuckert,* 482 U.S. 137, 153-54 (1987) (step two inquiry intended to identify claimants

whose medical impairments are so slight that it is unlikely they would be found disabled); *Webb

v. Barnhart,* 433 F.3d 683, 686 (9th Cir. 2005) (step two impairment "may be found not severe

*only if* the evidence establishes a slight abnormality that has no more than a minimal effect on an

individual's ability to work") (emphasis in original). The ALJ must, at step two, consider the

combined effect of all the claimant's impairments on his or her ability to function, without

regard to whether each alone is sufficiently severe. *Howard v. Barnhart,* 341 F.3d 1006, 1012

---

[3] DOT is a publication of the United States Department of Labor that gives detailed
requirements for a variety of jobs.  The Social Security Administration has taken administrative
notice of the DOT.  *Massachi v. Astrue*, 486 F.3d 1149, 1153 n. 8 (9th Cir. 2007). *See* United
States Department of Labor, DOT (4th ed. 1991), available at
www.occupationalinfo.org/contents.html. The Social Security Administration relies "primarily
on the DOT" for "information about the requirements of work in the national economy" at steps
four and five of the sequential evaluation process.  SSR 00-4p, 2000 WL 1898704 *2 (SSA)
(Use of vocational experts and occupational information in disability decisions).

(9th Cir. 2003); *Smolen v. Chater*, 80 F.3d 1273, 1289-90 (9th Cir. 1996); *see also* 42 U.S.C. §

423(d)(2)(B), 20 C.F.R. §§ 404.1523, 416.923.

To move beyond step two, Plaintiff must prove the existence of a physical or mental impairment by providing objective or clinical evidence. 20 C.F.R. §§ 404.1508. The claimant's own statement of symptoms is not sufficient. *Id.*

An impairment or combination of impairments is not severe if it does not significantly limit the claimant's physical or mental ability to do basic work activities. Basic work activities include the "abilities and aptitudes" necessary to do most jobs, including:  (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, standing, carrying or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521, 416.921. An impairment or combination of impairments can be found "not severe" only if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individual's ability to work." *See* SSR 85-28, 1985 WL 56856 *3 (S.S.A.). The ALJ found that Plaintiff's sleep apnea, esophagitis, IBS, and mental impairments were not severe. This finding is not erroneous. None of the evidence suggests that any of these impairments, alone or in combination with the others, significantly limits Plaintiff's ability to perform work-related activities.

Although Dr. Sobota mentioned a "positive sleep study in August 2008," in her March 2010 letter, this statement is based on her earlier chart notation, on September 9, 2009, that Plaintiff "apparently had a sleep study years ago but has yet to get the CPAP." Although Dr. Sobota noted in September 2009 that someone in her office was "working on this," there is no subsequent reference to a sleep study or to a diagnosis of sleep apnea. The ALJ correctly

found that the alleged impairment of sleep apnea was not supported by clinical evidence; the only evidentiary basis for Dr. Sobota's reference to a sleep study in August 2008 (before Dr. Sobota began treating Plaintiff) is her own chart note about an apparent sleep study done "years ago." In addition, when asked at the hearing about impairments that prevented him from working, Plaintiff made no reference to sleep apnea.

Clinical evidence is also lacking for IBS. Dr. Smith, the gastroenterologist, wrote that a CT scan of the abdomen in January 2009 had been unremarkable. The colonoscopy of September 2009 was also negative for IBS; mild inflammation in the gastrointestinal tract was attributed to NSAIDS. Dr. Sobota herself wrote that IBS was a "diagnosis of exclusion" that was based on the absence of any other diagnosis that would account for Plaintiff's reported symptoms. As discussed below, the ALJ found Plaintiff's subjective testimony not fully credible. *See Webb,* 433 F.3d at 688 (Credibility determinations bear on evaluations of medical evidence when an ALJ is presented with conflicting medical opinions or inconsistency between a claimant's subjective complaints and diagnosed conditions). I conclude that the ALJ did not err in finding that IBS was not a severe impairment.

Although there is clinical evidence that Plaintiff has been diagnosed with asthma and esophagitis, the evidence also shows that these conditions are controlled with medication and, therefore, are not severe. In August 2006, Plaintiff told Dr. Momi that asthma medication and inhalers were effective for his asthma. In September 2009, Plaintiff told Dr. Smith his GERD symptoms were completely controlled with Protonix twice a day. *See Warre v. Comm'r,* 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits"); *Sample v.*

*Schweiker*, 694 F.2d 639, 642 (9ᵗʰ Cir. 1992) (upholding ALJ's finding of no disability where the impairments were stabilized). When asked at the hearing about impairments that affected his ability to work, Plaintiff made no reference to asthma or esophagitis.

Finally, it appears that Carol Burckhardt was working under the supervision of Dr. Sobota. Tr. 277. She is, therefore, an acceptable medical source, contrary to the ALJ's finding. *Gomez v. Chater,* 74 F.3d 967, 971 (9ᵗʰ Cir. 1996) (opinions of nurse practitioner working under supervision of physician may be treated as part of the physician's opinion). Crediting Ms. Burckhardt's opinions, however, does not establish that Plaintiff's anxiety and depression are severe. As discussed above, there is evidence in the record that the antidepressant medication prescribed by Ms. Burckhardt was effective in alleviating Plaintiff's symptoms. *See, e.g.,* tr. 262 (Plaintiff's report to Ms. Joyce in December 2009 that after being on Celexa for two weeks, he was feeling more stable and sleeping five to seven hours a night and Ms. Joyce's observation that Plaintiff appeared relaxed); tr. 259 (Dr. Sobota's note that Plaintiff was in no apparent distress and appeared "better than usual"). Although Dr. Sobota said in her March 2010 letter that Plaintiff had discontinued Celexa and Depakote because of side-effects, her treatment records and those of Ms. Burckhardt do not indicate that the Celexa had been discontinued because of side-effects. When asked at the hearing about impairments that affected his ability to work, Plaintiff made no reference to depression or anxiety.

**B.    ALJ's Step Three Findings**

    1.    Rejection of Dr. Sobota's opinions

Plaintiff challenges the ALJ's rejection of Dr. Sobota's opinion that Plaintiff's impairments would result in his missing work in any full-time occupation, arguing that her

opinions were neither "overwhelmingly" based on subjective reports nor lacking corroboration by objective clinical findings. Plaintiff challenges this finding, arguing that: (1) it "has not been shown that Plaintiff's subjective reports were invalid;" and (2) a physician may properly rely on valid subjective reports. Plaintiff's arguments are not persuasive.

The ALJ rejected the opinions of Dr. Sobota in favor of the opinions of reviewing physician Dr. Mitchell. The ALJ may rely on the medical opinion of a non-treating doctor instead of the contrary opinion of a treating doctor only if the ALJ provides "specific and legitimate" reasons supported by substantial evidence in the record. *Holohan,* 246 F.3d at 1202; *Lester,* 81 F.3d at 830. The treating physician's opinion is still entitled to deference and must be weighted using all the factors provided in 20 C.F.R. § 404.1527. *Holohan,* 246 F.3d at 1202.

The opinions expressed in Dr. Sobota's March 2010 letter are explicitly based on what she has been told by Plaintiff, and the ALJ has properly considered these opinions in the light of his own adverse credibility findings. For example, Dr. Sobota says, "Michael's medical symptoms, most notably those related to his degenerative disc disease and his irritable bowel syndrome, *reportedly* impede his daily function[s] . . . ." Tr. 277. Dr. Sobota notes further, "He is currently prescribed Lyrica as well as oxycodone . . . but still *reports* severe pain that interferes with his ability to social [sic] and physical functioning," *id.,* and that Plaintiff "*reportedly* has been trying to help his landlord by doing low-stress administrative work . . . but 'can't take it,' feels weak and shaky, and has restarted smoking cigarettes . . . ." Tr. 278. "It is likely that his psychiatric symptoms greatly augment his physical symptoms. In the past, *by his own report,* he has been precribed Lithium, Cylert (a central nervous system stimulant no longer available in the USA) and numerous antidepressants." Dr. Sobota acknowledges that "we have not had access to

Opinion and Order, Page 25

any previous psychological reports, although Mr. McDonald *indicates* that he has had such assessments done at least 4 times in the past." *Id.* Even Dr. Sobota's conclusion that Plaintiff's psychiatric symptoms were "persistent" was based on Plaintiff's "very negative *personal perception* of ability to cope with stress and *low expectations* of ability to perform routine, scheduled work." *Id.*  (All emphasis added)

The ALJ may reject a treating physician's opinion if the opinion is premised on the claimant's subjective complaints and the ALJ has already validly discounted the claimant's complaints. *Fair v. Bowen*, 885 F.2d 597 (9th Cir. 1989); *Webb*, 433 F.3d at 688. Dr. Sobota expressly bases her opinions on Plaintiff's subjective reports, and as discussed below, the court concludes that the ALJ has validly discounted Plaintiff's subjective testimony.

2.    Rejection of Plaintiff's testimony

Plaintiff testified at the hearing that he had to lie in bed for "six out of every eight hours," with the other two hours spent sitting up or trying to move and that he cannot walk for more than 15 minutes before resting and cannot lift even a gallon of milk. The ALJ rejected this testimony on the grounds that it was inconsistent with Plaintiff's hearing testimony that he goes for two short bike rides per day and with Plaintiff's statements made to medical practitioners, including: (1) Plaintiff's statements to Donna Hammar in 2007 that Darvocet worked well for his pain, that he primarily used exercise to relieve his back pain, and that he had been caring for his friend's three children; (2) Plaintiff's report in May 2009 that when taking his medication his pain was "tolerable," and his report in December 2009 that the pain medications were controlling his pain adequately and he was not having spasms; and (3) Plaintiff's statements that he cooks and does his own housekeeping and "overextends" himself frequently.

Unless there is affirmative evidence that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's subjective testimony must be clear and convincing. *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005).  The ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints.  *Id.*; *Reddick*, 157 F.3d at 722. The evidence upon which the ALJ relies must be substantial. *See Reddick*, 157 F.3d at 724 and *Holohan*, 246 F.3d at 1208 (9th Cir. 2001).  Examples of clear and convincing reasons include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistencies either in a claimant's testimony or between that testimony and the claimant's conduct, daily activities inconsistent with the alleged symptoms, sparse work history, and testimony that is vague or less than candid, as well as testimony from physicians and other third parties about the nature, severity, or effect of the symptoms about which a claimant complains. *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008); *Lingenfelter v. Astrue*, 504 F.3d 1028, 1040 (9th Cir. 2007); *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

The ALJ rejected Plaintiff's hearing testimony about being required to lie down 18 hours a day and sit or try to move the remaining six hours a day because it was inconsistent with: (1) Plaintiff's hearing testimony that he went for two short bike rides a day; (2) his statement to Dr. Momi in 2006 that he had not taken pain medication for a year; (3) his later reports to medical providers that his pain was adequately controlled with medication; and (4) his reports to providers that his activities included caring for three children, riding a bicycle, cooking, and doing office work a few hours a week. The court concludes that these are clear and convincing reasons for rejecting Plaintiff's testimony and that they are based on substantial evidence in the record.

3.    Rejection of lay testimony

Lay testimony about a claimant's symptoms is competent evidence that the ALJ must take into account, *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993), unless he or she expressly decides to disregard such testimony, in which case "he must give reasons that are germane to each witness." *Id. See also Bayliss v. Barnhart,* 427 F.3d 1211, (9th Cir. 2005) (ALJ need only give germane reasons for discrediting testimony of lay witnesses, *citing Lewis v. Apfel,* 236 F.3d 503, 511 (9th Cir. 2001)).

The ALJ rejected the lay witness testimony because it was inconsistent with the medical evidence and because "at least one"[4] third-party statement said that Plaintiff could, in 2006, "still perform light office bookkeeping and filing and assist in telephone communications." This finding is germane to Mr. Doyle's testimony. Nor did the ALJ err in finding the testimony of all three witnesses inconsistent with the medical evidence. Inconsistency with medical evidence is a germane reason for discrediting the testimony of a lay witness. *Bayliss,* 427 F.3d at 1218. There are no objective medical findings that could reasonably be expected to produce the twitching described by Charlotte Eubank and Cornelia Doyle, particularly Ms. Doyle's statement that Plaintiff's twitching had moved from his legs to his entire body. Although leg twitching was observed by mental health counselors, no medical practitioner noted twitching on examination, and there is no indication in the record that Plaintiff reported whole body twitching to any of his medical providers. In addition, the observations of all three lay witnesses about Plaintiff's severe depression are undermined by evidence in the record that antidepressant medication was effective in controlling Plaintiff's symptoms.

---

[4] The only witness to provide such evidence was Mr. Doyle.

**C.       ALJ's Step Four Findings**

Plaintiff asserts that the ALJ erred at step four in finding that Plaintiff could return to his past work as a reservation clerk. He argues that he earned only $4,416.71 in 1998, when the threshold requirement for SGA was $6,000 per year. This argument is unpersuasive.

SGA and past relevant work are not synonymous. A claimant who is engaged in SGA is considered not disabled at step one. To constitute SGA, the activity must be both substantial (involves doing significant physical or mental activities, even if done part-time or on a modified schedule, *see* 20 C.F.R. 404.1572(a)) and gainful (work activity done for pay or profit, *see* 20 C.F.R. § 404.1572(b)). Past relevant work is a vocational factor, along with age, education, and ability to perform exertional requirements, that is addressed at steps four and five. *See* 20 C.F.R. § 416.960. Past relevant work is work that the claimant has done within the past 15 years, that was SGA, and that lasted long enough for the claimant to learn to do it. 20 C.F.R. § 416.960(b)(1). A claimant's work history is related to the question at step five of whether skills acquired through past work can be transferred to other work. *See* 20 C.F.R. § 416.695 "Work experience means skills and abilities you have acquired through work you have done which show the type of work you may be expected to do . . . . If you have acquired skills through your past work, we consider you to have these work skills unless you cannot use them in other skilled or semi-skilled work that you can now do.")

The ALJ found, based on Plaintiff's testimony, that Plaintiff had done the work of reservation agent for six months, long enough to learn the job. The record also shows that Plaintiff performed the work of reservation agent at the SGA level. Social Security regulations provide that for work performed between 1990 and 1999, monthly earnings averaging more than

$500 a month ordinarily show that a claimant has engaged in SGA. 20 C.F.R.

§ 404.1574(b)(2)(ii)(B). According to Plaintiff's earnings records, he earned $4,416.61 as a

reservations clerk. Plaintiff testified that he worked at this job for approximately six months. He

therefore averaged approximately $736.12 per month, an amount sufficient under the regulations

to constitute SGA.  I find no error by the Commissioner here.

**D.    ALJ's Step Five Findings**

Plaintiff asserts that the ALJ improperly found that he could perform the jobs identified

by the VE because under the ALJ's hypothetical question to the VE, Plaintiff was limited to

standing or walking for four to six hours of an eight-hour day, which vitiates a finding that

Plaintiff was capable of the exertional demands of light work. Light work involves lifting no

more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10

pounds.  20 C.F.R. §§ 404.1567(b), 416.967(b). Light work also involves either a great deal of

walking or standing or sitting most of the time with some pushing or pulling. *Id.* To be capable

of performing a full range of light work, a claimant must have the ability to do substantially all

of these activities. *Id.* Under DOT definitions, light work requires walking or standing to a

significant degree. *Dictionary of Occupational Titles* App. C (4th ed. 1991). The Commissioner

has ruled that the ability to perform light work requires the ability to stand or walk, off and on,

for six hours out of an eight-hour day. SSR 83-10, 1983 WL 31251 *6 (SSA).

Plaintiff is correct that the ALJ's RFC, which involved "standing and walking between

four and six hours in an eight-hour day," tr. 329, is inconsistent with the jobs of office helper and

cashier, both identified by the VE as light work. I conclude that the error is harmless, however,

because having found that Plaintiff was able to return to his past relevant work at step four,

(identified as sedentary), the ALJ was not required to make findings at step five identifying other jobs in the national economy that Plaintiff was capable of performing. *See, e.g., Matthews v. Shalala,* 10 F.3d 678, 681 (9th Cir. 1993) (because claimant had failed to show he could not return to his past employment, error at step five in hypothetical to VE is harmless).

Plaintiff also argues that the VE erred by identifying the sedentary job of semiconductor assembler as within Plaintiff's RFC because under the DOT, the job is classified as SVP 3,[5] semi-skilled, and the VE did not identify any skills Plaintiff could transfer to that job. Plaintiff urges the court to reject the VE's testimony that a Department of Labor publication entitled *Occupational Projections and Training Data 2008-2009 Edition*, published in February 2008, and a state of Oregon Employment Department publication entitled *Employment Projections by Industry and Occupation 2008 through 2018*, published in December 2009, indicated that as normally performed, the job of semiconductor assembler could be learned in 30 days or less, equivalent to unskilled work.

As discussed above, any error by the ALJ at step five is harmless because Plaintiff failed to carry his burden of showing, at step four, that he was unable to return to his past relevant work.

**E.    Preclusive Effect of Previous Decision**

Plaintiff argues that the ALJ erred by applying *Chavez*'s presumption of continuing disability and finding that Plaintiff had the same RFC as that found by the ALJ in the previous

---

[5] SVP stands for Specific Vocational Preparation, which is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. DOT Appendix C, available at http://www.occupationalinfo.org/appendxc_1.html#II. An SVP of one or two means that a job requires preparation of up to one month. *Id.*

disability decision. He argues that under *Chavez*, the claimant can overcome the presumption by proving "changed circumstances" indicating a greater disability, which Plaintiff did by showing that he had a herniated disc and nerve root abutment, severe sleep apnea, and severe esophagitis.

The argument is not persuasive. As discussed above, the ALJ properly found that Plaintiff's sleep apnea and esophagitis were not severe impairments. There is no indication in the medical evidence that the annular tear and nerve root abutment constituted changed circumstances. According to Dr. Momi's records, the MRI dated April 30, 2006, showing an annular tear with central disc bulge at L4-5 and L5-S1, was not significantly different from an MRI done in 2001, which was before the 2003 non-disability decision. Plaintiff's argument that his herniated disc and annular tear constituted a changed circumstance that rebutted the 2003 finding of non-disability is contradicted by Dr. Momi's finding that the 2001 and 2006 MRIs were not significantly different. In any event, the ALJ did not apply the presumption of non-disability to Plaintiff's disc disease; rather, he found that Plaintiff's disc disease was a severe impairment and proceeded through the remaining steps of the sequential analysis. I find no error here.

## V.  CONCLUSION

The Commissioner's decision is AFFIRMED.

IT IS SO ORDERED.

DATED this 26th day of March, 2012.

_____/s/ Michael H. Simon_____

Michael H. Simon
United States District Judge